**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 5627 |
| | ) | |
| ILLINOIS SCHOOL DISTRICT U-46, | ) | Judge Jorge L. Alonso |
| MORRIS MALLORY, and | ) | |
| MIGUEL RODRIGUEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendants' motion to dismiss the verified second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the motion is granted.

### BACKGROUND

Plaintiff, Robert Smith, brought this case against Illinois School District U-46 (the "District") and two of its employees: Morris Mallory, the principal of Gifford Street High School ("GSHS"); and Miguel Rodriguez, the District's Chief Legal Officer and Secretary of the School Board. Smith asserts First Amendment retaliation claims under 42 U.S.C. § 1983 as well as a claim under the Illinois Whistleblower Act.

The Verified Second Amended Complaint alleges the following facts, which are taken as true for purposes of this motion.[1] From 2010 to the present, Smith has taught science at GSHS, a school that is part of the District's "Alternative Programs" for at-risk students. (R. 32, V. Second Am.

---

[1]The complaint is prolix, so the Court sets out only as much of the factual background as is required to resolve the pending motion.

Compl. ("Compl.") ¶¶ 14, 16.)  In spring 2012, Mallory gave Smith a poor performance evaluation, and Smith lodged a formal rebuttal.  Since then, Mallory has treated Smith "contemptuously."  (*Id.* ¶ 22.)  On October 2, 2012, Smith was teaching a class in Room 319 of GSHS, which he shared with a fellow teacher (the "coworker").  (*Id.* ¶ 23.)  Several students using school computers told Smith that they had discovered the coworker's mug shot on a website that displays mug shots.  (*Id.* ¶ 24.)  According to the website, the coworker had been arrested for forgery.  (*Id.* & R. 32-1, Ex. A, Aff. of Robert Smith ("Smith Aff."), Ex. 1.)  At the end of the school day, Smith attempted to find Officer Kathy Schreiner, the Elgin Police Department's liaison to GSHS, but was unable to do so, and he went home.  (*Id.* ¶ 26.)  That evening, Smith searched the Kane County Circuit Court's website to determine the outcome of the forgery arrest.  (*Id.* ¶ 27.)  On that Court's website, Smith discovered that the coworker had been arrested for forgery in April 2012 and retail theft in April 2011.[2]  (*Id.* ¶ 27.)  On another website, Smith discovered that the coworker had been arrested sixteen years earlier for impersonating a government official.  (*Id.* & Ex. A, Smith Aff., Ex. 4.)

The next morning, Smith met with Schreiner and explained that he was "concerned" that the coworker "would be permitted to continue teaching despite his criminal record."  (*Id.* ¶ 28.)  Schreiner advised him to inform GSHS administration immediately.  Shortly thereafter, Smith emailed Mallory and John Heiderscheidt, the District Safety Coordinator.  (*Id.* ¶¶ 21, 29.)  The email stated in pertinent part that while monitoring student computer work the prior day, Smith had "discovered a few students on inappropriate websites" such as the mug shots site and that the coworker had "appeared on a number of the websites."  Smith stated further that he "wanted [the recipients] to be aware of the situation" because he was "sure the students will be talking about the

---

[2]It is alleged that it "later came to [Smith's] attention" that the coworker had pleaded guilty to both offenses.  (Compl. ¶ 27.)

website findings over the course of the next few days." Smith did not mention the results of his own research or anything about the particular charges involved. (*Id.*, Ex. A, Smith Aff., Ex. 5.) When Heiderscheidt replied that Smith should forward the email to "HelpDesk" so that it could address his "concerns with the District protection," Smith responded that his concerns were "not so much for monitoring the [internet] usage," but "for the commotion it caused by the students seeing a current teacher on the various websites and the charges listed in association with the mugshot." (*Id.*) Heiderscheidt responded, "Got it thanks." (*Id.*) Smith felt that this response was "inadequate," and Mallory had not responded, so Smith attempted to arrange a meeting with Mallory, but Mallory was out of town for the remainder of the week. (*Id.* ¶ 31.)

The same afternoon, a District computer technician came into Smith's classroom to perform work on the teachers' computer. Smith had not requested that any work be done, so he asked what was wrong, and the technician said that the coworker had been having trouble with the Firefox browser failing to open certain websites. (*Id.* ¶ 32.) Because Firefox was not a District-approved program, Smith believed it should not have been installed on the teachers' computer. After the technician left, Smith examined the Firefox browser history. (*Id.* ¶ 33.) Smith concluded that his coworker had been accessing what Smith believed were "inappropriate" websites, including search results for the term "sexy devil."[3] (*Id.*) The complaint also alleges that "[a]t or around the same time, Smith discovered inappropriate photographs of female students in [the] desk [that he shared with the coworker] in Room 319, along with the school-issued identification cards of several current and former female students." (*Id.* ¶¶ 33, 36, 45.) The complaint does not explain the significance

---

[3]Plaintiff has attached to his affidavit a printout of the search results, from which it appears that the search for "sexy devil" may have occurred in the context of a "shopping" search for Halloween costumes on the Bing search engine. (Compl., Ex. A, Smith Aff., Ex. 6.)

of the discovery of the identification cards or in what way the photographs were "inappropriate."

Smith showed "the apparently inappropriate browsing history" to Rod Watson (whose role at the school the complaint fails to specify), who advised Smith to inform GSHS adminstration at once, and Carol Collum, the GSHS Dean of Students, who instructed Smith to "document" the browser history. (*Id.* ¶¶ 34-35.) Smith printed out the browser history and gave it to Collum later that day. (*Id.* ¶ 36.) Smith also requested that he be transferred out of Room 319. (*Id.*) On October 8, 2012, Smith contacted Lisa Jensen, the District's Director of Employee and Labor Relations, and scheduled a meeting for the next day, and also provided copies of the browser history to Mallory and Collum. (*Id.* ¶ 39.)

On October 9, 2012, at Collum's direction, Smith completed a "formal incident report" in which he described his review of the computer browser history on the teachers' computer in Room 319, stated that he had "determined some of the websites to be pornographic in nature," and mentioned the coworker's "criminal activity" without providing specifics. (*Id.* ¶¶ 38, 40 & R. 32-2, Smith Aff., Ex. 7.) The report did not mention anything about photographs or identification cards found in the desk in Room 319. (R. 32-2, Smith Aff., Ex. 7.) In the report, Smith opined that the coworker "had no business being in the building pending" an outcome of a "formal investigation," and he reiterated his request to move classrooms. (*Id.*) The same day, Smith had a meeting with Jensen, Rodriguez, and Christopher Nemec, an Elgin Teachers Association ("ETA") union representative, to discuss Smith's concerns about the coworker. (Compl. ¶ 41.) Smith provided Jensen and Rodriguez with a copy of his report and the browser history printout. Jensen stated that she would contact Mallory to discuss the issues and that she would provide the District Superintendent, Jose M. Torres, with a copy of the report and browser history printout. (*Id.* ¶ 42.)

On October 11, 2012, Smith and Nemec were summoned to a meeting with Mallory,

Heiderscheidt, and Collum.  (*Id.* ¶ 44.)  Heiderscheidt asked Smith "extensive questions" regarding the basis for Smith's concerns about the coworker.  Mallory said that Smith would remain in Room 319 through the end of the week, but would be transferred to Room 305 on October 29, 2012.  Heiderscheidt also stated that the written information Smith had provided would be passed on to Human Resources, which would investigate further.  (*Id.*)  The next day, Smith met privately with Heiderscheidt to express his concerns about the photographs and identification cards he had found in the desk he shared with the coworker, because Smith "no longer trusted" that Mallory would "even acknowledge a problem existed, much less take steps to address that problem."  (*Id.* ¶ 45.)

On October 16, 2012, Mallory emailed room assignments to GSHS staff.  Despite Mallory's prior statement that Smith would be moved to Room 305, Smith was in fact moved to Rooms 313 and 314.  (*Id.* ¶ 47.)  The teacher who taught in Room 313 was "irate" and "confronted" Smith, stating "in vulgar and abusive terms" that she would not allow Smith to set up his "mad scientist" equipment in her classroom.  (*Id.* ¶ 48.)

Later that day, Smith met with Jensen about the room issue; he was concerned that because he had been moved to classrooms in which he had never taught, the coworker about whom he had made reports would be "able to deduce" that Smith had complained about him and requested a room change.  Jensen "expressed outrage" that Mallory had "reneged on his agreement" to move Smith to Room 305, and she instructed Smith to get an explanation from Mallory and report back to Jensen that day.  (*Id.* ¶ 49.)

Smith and Nemec then met with Mallory, and although Mallory ultimately agreed to allow Smith to teach in Room 305 if Smith obtained the consent of the other teacher who was assigned to that room, Mallory "refused to formally change" Smith's room assignment because he would have to explain a formal change to District administration.  (*Id.* ¶ 50.)  When Smith attempted to report

back to Jensen regarding the meeting with Mallory, Jensen failed to return two phone messages and never followed up with Smith regarding the room issue. (*Id.* ¶ 51.)

On October 17, 2012, because Jensen was unavailable, Smith met with Rodriguez and told him that the Room 313 teacher's "verbal abuse of the previous day was creating an intolerable environment." Rodriguez said that he would instruct Jensen to call Smith before the end of the day. Rodriguez also said that Jensen was handling the investigation of the coworker Smith had complained about. Jensen failed to contact Smith that day. (*Id.* ¶ 52.) On October 18, Smith sent an email to Jensen in which he requested a meeting and complained about a "hostile work environment." (R. 32-2, Smith Aff., Ex. 8.) Jensen responded that she was in meetings and would be in contact the following week. (*Id.*) Smith replied, explained that he had met with Rodriguez, and expressed his willingness to meet with Jensen "in a one on one situation." (*Id.*) Smith also informed Jensen in the email that he had begun "utilizing the District's Employee Assistance Program" in order "to deal with the stress caused by his workplace environment." (Compl. ¶ 53.) Jensen did not follow up with Smith. (*Id.*)

On October 22, 2012, Smith emailed his colleagues to advise them that he was planning to take November 2 off, and he offered them the opportunity to substitute for him. The coworker about whom Smith had complained offered to cover one class in exchange for another on October 26. (*Id.* ¶ 54.) Smith repeatedly informed the coworker that the coworker would need to get administration approval for the room change that such a swap would necessitate. (*Id.* ¶¶ 54-55.) Smith went to Mallory's assistant to inquire about the swap; the assistant informed him that the coworker had not requested to take the day off on October 26. Mallory was present during that conversation. (*Id.* ¶ 56.) On October 25, the coworker again raised the issue of them swapping classes, and Smith again stated that the coworker would have to get administration approval. The coworker never did, and

Smith did not cover the coworker's class on October 26. (*Id.* ¶ 57.)

On October 29, 2012, the coworker "angrily confronted" Smith and asked why Smith had not covered the October 26 class. The students in that class had apparently been unsupervised for more than ninety minutes, which is a violation of District policy. Smith responded that the coworker had never obtained permission for the class swap. Subsequently, the coworker falsely claimed to Mallory, Collum, and Kevin Lane (the Director of Student Discipline) that Smith had agreed to cover his class on October 26 but had failed to do so. (*Id.* ¶ 58.) Smith then sent an email to Jensen on October 30 stating that "[a]nother situation occurred yesterday involving the work environment, please contact me if you need to discuss the incident." (*Id.* ¶ 59 & R. 32-2, Smith Aff., Ex. 11.) Jensen responded the next day that she had been ill and would call him the following day, but failed to respond to Smith's next email providing times when he would be available to talk. (*Id.*) The same day, Smith met with Mallory and Collum and informed them that he "would not tolerate" the coworker's "lying about his behavior." During this meeting, Mallory acknowledged that he had overheard Smith's conversation with Mallory's assistant on October 24. (Compl. ¶ 60.)

As of late November 2012, no one in Human Resources or GSHS administration had contacted Smith about the "concerns" he had raised about his coworker in October. (*Id.* ¶ 61.) On November 26, it came to Smith's attention that the coworker was organizing a student field trip scheduled for December 14 and the cost would be $18 per student. (*Id.* ¶ 62.) Smith "found this number to be excessive in light of the fact that the costs associated with the field trip were almost exclusively related to transportation." (*Id.*) Smith was "particularly concerned" that, in light of the coworker's criminal history, "he may be attempting to either misappropriate District funds and/or simply steal a portion of the money collected from the students." (*Id.*) To ask for "guidance," Smith called Heiderscheidt, who advised Smith to make a report to Jensen and/or Mallory. When Smith

requested to meet with Heiderscheidt in person, Heiderscheidt informed him that Human Resources had instructed him not to meet with Smith. (*Id.* ¶ 63.) Smith then set up a meeting with Collum and Mallory on November 28, at which Smith provided them with a document "detailing how he believed" the coworker "was planning to improperly retain a portion of the funds from the upcoming field trip." (*Id.* ¶ 64.) Mallory[4] stated that he would monitor the financial aspects of the upcoming field trip and requested that Smith report any new information he received. (*Id.*)

On November 30, 2012, because Mallory and Human Resources "still had not addressed" Smith's "earlier concerns" he had raised about the coworker, Smith sent an email to Superintendent Torres stating that after "two months of emotional turmoil," he wished to meet with Torres regarding the "instances of alleged misconduct by U-46 [sic] staff member" that Smith had reported to "[his] administration, Director of Safety, Human Resources, & Chief Legal Officer." (*Id.* ¶ 66 & R. 32-2, Smith Aff., Ex. 13.) Torres responded (with copies to Mallory and Johnson) by requesting that Smith "follow the chain of command" and first meet with Mallory's supervisor, Barbara Johnson, and then "if necessary, reach out to [Torres] after meeting with" Johnson. (R. 32-2, Smith Aff., Ex. 13.) Smith replied on December 6, requesting that his communications with Torres "remain confidential and private" and stating in part that "[t]here are circumstances in the upcoming immediate future that need to be addressed"[5] and that he was "not confident involving Dr. Johnson or any other individuals would be beneficial at this point." (R. 32-2, Smith Aff., Ex. 14.) Torres responded, "Dr. Johnson is your next step." (*Id.*) Smith then emailed Johnson on December 7 and

---

[4]Paragraph 64, as well as several other paragraphs of the complaint, erroneously refers to "Mr. Morris" instead of "Mr. Mallory."

[5]Smith's concern (unstated in the emails to Torres) was that the field trip was "rapidly approaching," and he wanted to bring the issue of the coworker's "potential misconduct (and past misconduct)" to Torres's attention. (Compl. ¶ 67.)

requested a meeting with her.  (Compl. ¶ 67.)

Before Smith had the opportunity to meet with Johnson, Mallory called him into a meeting on December 10, 2012 to inquire why Smith had involved Torres.  Also in attendance were Heiderscheidt, Collum, and Nemec.  Smith explained to Mallory that he felt that his labor rights had been violated since he had initially complained about the coworker.  (*Id.* ¶ 69.)  Mallory then wrote an email to Johnson (copying the meeting participants and Rodriguez) that summarized the meeting and stated that Smith felt that his rights[6] had been violated because no one from Human Resources had followed up with him regarding his October complaint.  (*Id.* & R. 32-2, Smith Aff., Ex. 15.)

In response to Mallory's email summarizing the meeting, Rodriguez replied to Mallory, copying Johnson and all of the meeting participants, including Smith, and stated that he and Jensen had met with Smith and thereafter concluded that Smith's complaint was "essentially baseless." (Compl. ¶ 70 & R. 32-2, Ex. 16.)   Rodriguez further stated that he and Jensen thought it would be best for Mallory to deal with "this disgruntled employee," and he questioned why it would be necessary for Johnson to meet with Smith, since Smith had "no valid claim."  (R. 32-2, Smith Aff., Ex. 16.)[7]

On December 13, 2012, Smith and Nemec met with Johnson and a District staff attorney. (Compl. ¶ 71 & R. 32-2, Smith Aff., Ex. 17.)   During the meeting, Smith expressed his "dissatisfaction" with Jensen and Rodriguez's "disregard" of his concerns.  (Compl. ¶ 71.) Johnson

---

[6]According to Smith, Mallory erroneously stated in the email that Smith had referred to his "human" rights when he had actually mentioned his "labor" rights.  (Compl. ¶ 69.)

[7]Given the content of the email and the fact that none of the statements therein are addressed to Smith directly and Rodriguez refers to Smith in the third person, there is a distinct possibility that Rodriguez accidentally clicked "reply to all" and did not intend for Smith to see this email.  (*See* R. 32-2, Smith Aff., Ex. 16.)

apologized for the Human Resources department's having "ignor[ed]" Smith's concerns and assured Smith that steps would be taken in the future to ensure that it would not happen again. (*Id.*) After the meeting, while Smith and Nemec were waiting outside a classroom for Mallory so that they could tell him about the meeting with Johnson, they were approached by Dean's Assistant Ken Arrington. (*Id.* ¶ 72.) Arrington began to berate Smith for making reports about the coworker, accused Smith of setting out to "ruin" the coworker, and told Smith that if he had a problem with the coworker, he needed to settle it "face to face." (*Id.*) When Mallory arrived, he escorted Smith, Nemec, and Arrington into a nearby vacant classroom to continue the discussion, but rather than stopping Arrington's "tirade," Mallory "allowed" Arrington to "continue verbally abusing [Smith] for nearly 30 minutes." (*Id.*) Arrington stated, among other things, that Smith was "sneaky," "gutless," and "had no balls." (*Id.*) The next day, Smith emailed the president of the ETA, Kathryn Castle, about the conversation with Arrington. Castle informed Smith that his only recourse was to file a grievance with Human Resources, which Smith believed would be futile due to the department's failure to respond to his other concerns. (*Id.* ¶ 73.)

Smith participated in the field trip on December 14, 2012, during which he obtained figures from the bus drivers regarding transportation costs and realized that he had "overestimated" those costs in the original cost analysis he had provided to Collum and Mallory. (*Id.* ¶ 74.) On December 17, he provided them with a revised cost analysis. A few days later, Mallory approached Smith and told him that there had been some "small overages" relating to the field trip and stated that he would "keep an eye on this" in the future. (*Id.* ¶ 75.) Smith understood the statement as an "admission" that the coworker had "embezzled funds" from the field trip but that Mallory did not plan to do anything about it. (*Id.*) Therefore, on January 11, 2013, Smith emailed Collum to request a meeting with her about the field trip charges. (*Id.* ¶ 76.) They met shortly thereafter, and Smith explained

to Collum that his "concerns regarding [the coworker's] potential overcharging of students for field trips had still not been addressed." (*Id.*) Collum encouraged Smith to meet with Mallory. (*Id.*) In mid-January 2013, Smith and Nemec met with Mallory regarding Smith's continuing concerns about the field trip costs. Mallory became agitated and suggested that Smith was "calling into question not only [Mallory's] ability to conduct an investigation, but also his integrity." (*Id.* ¶ 77.) Smith "decided to drop the subject" until Mallory "had a chance to calm down." (*Id.*)

On February 4, 2013, Smith was supervising students who were eating lunch in the GSHS cafeteria. (*Id.* ¶ 78.) Smith was standing in a cafeteria doorway when one of his students, Anthony Salazar, approached him. Salazar was about 5 feet 8 inches tall and weighed about 200 pounds. (*Id.*) Salazar attempted to leave the cafeteria, and Smith informed him that students were required to stay in the cafeteria until the end of the lunch period, which would have been about five minutes later. (*Id.* ¶ 79.) Salazar then "shoved" Smith "with great force out of the doorway and into the hallway." (*Id.*) Smith moved back into the doorway and repeated that Salazar was not permitted to leave the cafeteria. Salazar then "shoved" Smith again and "began to physically grapple with him." (*Id.*) Because Smith felt that Salazar's behavior was "posing a danger" to Smith, Salazar, and "potentially other students," and because it was "clear" that Salazar "had no intention of stopping his attack on" Smith, Smith placed Salazar in a "modified headlock." (*Id.* ¶ 80.) Salazar then said that he "was done" and "would quit," so Smith released Salazar and told him to return to the cafeteria, which Salazar did. "The entire incident took approximately 20 seconds." (*Id.*) Smith "placed a friendly arm" around Salazar as Smith "escorted him back to the cafeteria," and Salazar "reciprocated." (*Id.* ¶ 81.)

Later that day, Mallory and Arrington viewed security-camera footage of the incident involving Smith and Salazar. Mallory stated that he was "sick of [Smith's] shit" and that Smith was

"done, outta here." (*Id.* ¶ 82.) Smith and Nemec briefly met with Mallory that afternoon and again on February 6, 2013 to discuss the incident. (*Id.* ¶ 83.) On February 7, Smith provided Mallory with a written statement about it. (*Id.*)

On February 5, Mallory had approached Salazar to obtain a statement from him. During this discussion, Mallory "instructed [Salazar] to lie and state that" Smith had "started the altercation." (*Id.* ¶ 84.) When Officer Schreiner interviewed Salazar on February 19, Salazar stated that he was just "'messing around' when he instigated" the February 4 incident with Smith and that he and Smith "were 'cool' with one another." (*Id.*)

The complaint alleges that defendants "proceeded to convene a kangaroo court to punish" Smith for the February 4 incident, in retaliation for his "continued reporting" of the coworker's "misconduct." (*Id.* ¶ 85.) On February 15, 2013, Smith was "suddenly pulled out of class" by Mallory, who instructed him to leave the school grounds and informed him that Human Resources had placed him on paid administrative leave. (*Id.*) Smith alleges that Rodriguez "based his decision to suspend [Smith] solely on the approximately 20 seconds of video surveillance footage that showed part of the altercation between [Smith] and [Salazar], and despite knowing that [Salazar] had admitted (corroborated by Officer Schreiner's report) that he had started the altercation, that [Smith] was merely protecting himself, no excessive force was used, and that [Salazar] was unhurt." (*Id.*)

On February 26, 2013, Smith received an email from Rodriguez stating that District administration had scheduled a March 4 disciplinary meeting regarding the altercation with Salazar. (*Id.* ¶ 86.) During that meeting, Smith was informed that he would be suspended without pay for ten days and that the District would be presenting a Notice to Remedy (recommending disciplinary action) to the School Board (the "Board") during a closed-door meeting on March 11. (*Id.* ¶ 87.)

At the March 4 meeting, Smith requested that the District provide him and the full Board with a copy of the full report Officer Schreiner had created about the incident. Smith never received the report and "was informed" that the Board members did not receive the report. (*Id.* ¶ 88.) For three days after the meeting, Smith's District email account was "coincidentally suspended," and he could not access the District's intranet site. (*Id.* ¶ 89.)

At the March 11, 2013 Board meeting, Rodriguez "presented the District's case" to the Board. (*Id.* ¶ 90.) Before showing the Board the video of the altercation between Smith and Salazar, Rodriguez called the incident the "most violent and disturbing teacher/student interaction [he had] seen in [his] 25 years in education." (*Id.* (alteration in original).) According to Smith, Rodriguez's narration during the video "consisted almost entirely of either a gross exaggeration of the facts or outright fabrications." (*Id.*) At one point, Rodriguez remarked that Smith appeared to be "throwing punches" at Salazar, but the footage contains no such evidence. (*Id.*) Rodriguez remained in the room while the Board deliberated Smith's case, and he participated in the deliberations, which Smith contends was improper. (*Id.* ¶ 91.) The Board unanimously adopted the District's Resolution Authorizing Notice to Remedy, and Smith remained on unpaid administrative leave until March 18, 2013. (*Id.* ¶ 96.) The Board also informed Smith that he would be required to attend Crisis Prevention Institute ("CPI") training. (*Id.*) On March 18, when Smith reported back to GSHS, Mallory informed him that his CPI training was to begin immediately and directed him to report to Heiderscheidt in Room 239. The District did not arrange for a substitute teacher to cover Smith's classes that day. (*Id.* ¶ 97.)

Smith alleges that in making its decision, the Board failed to consider Salazar's written statement about the incident as well as Officer Schreiner's report. (*Id.* ¶ 92.) He also alleges that contrary to Rodriguez's claims, incidents like the one with Salazar "occur at GSHS almost as a

matter of routine,"[8] and "[m]yriad other examples" involving staff members such as Mallory, Arrington, and the coworker did not result in their having been disciplined. (*Id.* ¶ 93.) According to Smith, he is the "only teacher to be suspended without pay for defending himself against a student's violent attack by restraining the student," and, since Smith has been at GSHS, "no teacher has been placed on unpaid administrative leave for physically restraining a student" when the student poses a danger to others or himself. (*Id.* ¶¶ 93-94.) Further, in Smith's experience, "unpaid suspensions are rarely given to teachers," and other GSHS teachers "who have been accused of far more serious violations have not been placed on unpaid suspension at all, much less for ten days." (*Id.* ¶ 95.)

On March 20, 2013, Smith filed a lawsuit in Kane County Circuit Court for violation of the Illinois Whistleblower Act, seeking to enjoin the District, Mallory and Rodriguez "from further retaliatory actions."[9] (*Id.* ¶ 98.) The court denied Smith's motion for a restraining order, and Smith then voluntarily dismissed the action in July 2013. (*Id.* ¶ 99.) Thereafter, defendants "tried harder than ever to continue their retaliation" against Smith. (*Id.* ¶ 100.) The coworker about whom Smith had complained "became involved in several violent incidents involving students and openly bullied and threatened staff with violence, specifically including" Smith and Nemec. (*Id.* ¶ 101.) From November 2013 through May 2014, Smith and Nemec "lobbied extensively" for Mallory, Rodriguez, Human Resources, the District's legal department, and the Assistant Superintendent, Ron Raglin, to "take action against" the coworker "for his abusive and threatening conduct," and Smith

---

[8]Smith alleges elsewhere in the complaint that "[v]iolence among the students is pervasive, and a police presence is maintained at the school." (*Id.* ¶ 16.)

[9]The complaint implies, but does not expressly state, that District, Rodriguez, and Mallory were all named as defendants in that suit. (*Id.* ¶ 98.)

"continued to report" the coworker's alleged "embezzlement of school funds on field trips" to Mallory, but the defendants and Board took no action against the coworker. (*Id.* ¶¶ 102-03 & R. 32-5, Supplemental Aff. of Robert Smith ("Supp. Smith Aff.") ¶¶ 12-30.)

In November 2013 and May 2014, Smith also reported the coworker's "threatening, dangerous and potentially criminal behaviors"[10] to Officer Stephen Heike of the St. Charles Police Department and to Smith's ETA representatives. (Compl. ¶ 104.) Smith also informed Mallory "of his contacts with law enforcement." (*Id.*) Smith alleges that the defendants "not only continued to ignore his reports of violent, abusive [sic] and theft of State property," but Rodriguez also instructed Human Resources and the Board not to meet with or respond to Smith's or Nemec's reports. (*Id.* ¶ 106.) At a meeting on May 29, 2014, and purportedly at Rodriguez's direction, Mallory threatened Smith and Nemec with disciplinary action if they made any further reports about the coworker that did not result in the coworker's immediate termination. (*Id.* ¶ 107.)

Smith alleges that defendants further retaliated against him in April 2013 by requiring him to use vacation time when he came in late or had to leave early for child-care reasons and then, during the 2013-2014 school year, began docking his pay for partial-day absences when he reported that he planned to skip his lunch hour to compensate for arriving late. (*Id.* ¶ 111 & Supp. Smith Aff. ¶¶ 3-10.) Other teachers were not treated the same way. (Compl. ¶ 111.)

In Count I of the complaint, Smith alleges that Mallory and Rodriguez retaliated against him in violation of his First Amendment rights by threatening to severely discipline him should he continue to report on the coworker's actions, instructing Human Resources and school staff not to meet with him or take complaints from Smith, and by docking his pay for late arrivals and early

---

[10]The complaint does not describe any of these "behaviors" or the allegedly "threatening" conduct.

departures and "otherwise singling him out for discipline." (*Id.* ¶ 124.) In Count II, Smith asserts a *Monell* claim against the District for violating his First Amendment rights. Count III is a claim against all defendants pursuant to the Illinois Whistleblower Act, 740 ILCS 174/15(b) (the "IWA"), for retaliating against him for disclosing information to a government or law enforcement agency. The retaliatory acts of which Smith complains in Count III are "placing him on unpaid administrative leave, violating his labor rights, creating and maintaining a hostile work environment to punish" Smith for making protected disclosures under the IWA, and "by threatening material and adverse employment consequences if he continued to report." (Compl. ¶ 141.) Plaintiff seeks declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs. Defendants move to dismiss the complaint.

## DISCUSSION

### A. Legal Standards

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis omitted). Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

## B.    First Amendment Retaliation Claim Against Mallory and Rodriguez (Count I)

Smith sues Mallory and Rodriguez in both their individual and official capacities. (Compl. ¶¶ 9-10.)

### 1.    Official Capacity

Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008). Plaintiff's suing Mallory and Rodriguez in their official capacities is the equivalent of suing the District, which is already a named defendant that is appearing in this action. Therefore, the claims against Mallory and Rodriguez in their official capacities are redundant of the claim against the District and are dismissed with prejudice. *See, e.g., Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) ("The district court correctly dismissed [the individual] defendants in their official capacity because the [plaintiffs] also sued the District."). Smith contends that his official-capacity claims against Mallory and Rodriguez should be allowed to proceed because these defendants possessed policymaking authority. (R. 47, Pl.'s Br. Opp'n Defs.' Mot. 4.) But the real party in interest in an official-capacity claim is the governmental entity and not the named official, *Hafer*, 502 US. at 25, and the Court will address below whether Smith has stated a claim against the District on the theory that Mallory and Rodriguez were final policymakers.

### 2. Individual Capacity

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Whether a public employee's speech is protected by the First Amendment is a question of law. *Graber v. Clarke*, 763 F.3d 888, 894 (7th Cir. 2014). "The First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014) (alteration in original) (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). To establish a prima facie case of First Amendment retaliation, a public employee must show that (1) his speech was constitutionally protected; (2) he suffered a deprivation likely to deter speech; and (3) his speech was at least a motivating factor in the defendants' actions. *See Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013); *Kidwell v. Eisenhauer*, 679 F.3d 957, 964-65 (7th Cir. 2012). Although making a prima facie case is an evidentiary requirement and not a pleading standard, this requirement lends guidance to the Court's determination of whether Smith has sufficiently alleged a First Amendment retaliation claim under *Twombly* and *Iqbal*. *See, e.g.*, *Schmidt v. Vill. of Glenwood*, No. 14 C 9112, 2015 WL 3918952, at *3 (N.D. Ill. June 24, 2015). The first and third elements are disputed here.

For a public employee's speech to be constitutionally protected, the employee must show that (1) he made the speech as a private citizen; (2) the speech addressed a matter of public concern; and (3) his interest in expressing that speech was not outweighed by the employer's interests in "promoting effective and efficient public service." *Swetlik*, 738 F.3d at 825. Defendants first contend that Smith's speech is not actionable because it was made in Smith's capacity as an

employee rather than as a private citizen. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007) (citing *Garcetti*, 547 U.S. at 424-25). The Seventh Circuit has discussed *Garcetti* as follows:

> Although the *Garcetti* Court chose not to "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," it did provide guidance on the subject. Public employee speech does not lose First Amendment protection because it concerns the subject matter of the employee's job. To the contrary, the Court reaffirmed that public employees are often "the members of a community most likely to have informed and definite opinions" on matters of public concern, and that it remains "essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." Likewise, public employees' speech is not subject to restriction simply because it occurs inside the office, since "[m]any citizens do much of their talking inside their respective workplaces." In other words, speech does not "owe[ ] its existence to a public employee's professional responsibilities" within the meaning of *Garcetti* simply because public employment provides a factual predicate for the expressive activity; rather, *Garcetti* governs speech that is made "pursuant to official duties" in the sense that it is "government employees' work product" that has been "commissioned or created" by the employer.

*Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013) (alterations in original) (quoting *Garcetti* throughout) (citations omitted). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379.

With these considerations in mind, the Court turns to the speech at issue in Smith's complaint. Smith alleges that defendants retaliated against him for speaking about the coworker's (1) criminal history; (2) possession of identification cards and "inappropriate" photographs of

female students; (3) internet browser history; (4) possible attempt to overcharge students for a field trip; and (5) false accusation that Smith failed to cover a class for him and threatening and "bullying" behavior.[11]   Defendants argue that Smith's speech related to the misconduct of a coworker and that such internal complaints "are universally considered part of the actual job duties than an employee is expected to perform."  (R. 44, Defs.' Mem. Supp. Mot. 6.)  The decisions defendants cite in support of that argument do not stand for quite that broad a proposition.  In *Spalding v. City of Chicago*, 24 F. Supp. 3d 765, 776 (N.D. Ill. 2014), Judge Feinerman reviewed Seventh Circuit precedent on this issue and concluded:

> The cases draw the following line regarding a public employee's reporting of official misconduct.  If the employee reports misconduct in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility, then the employee speaks pursuant to her official duties and her speech is unprotected. . . . By contrast, if the employee testifies regarding misconduct to a jury or grand jury or reports misconduct outside established channels or in violation of official policy, she speaks as a private citizen and her speech is constitutionally protected.

*Id.* (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1091 (7th Cir. 2008); *Vose*, 506 F.3d at 570-71; *Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007); *Spiegla v. Hull*, 481 F.3d 961, 963 (7th Cir. 2007); *Chrzanowski*, 725 F.3d at 739-40 (7th Cir. 2013); and *Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009)).  Moreover, the Seventh Circuit has held that "a public employee's commentary about misconduct affecting an area within [his] responsibility is considered speech as an employee even where investigating and reporting misconduct is not included in [his] job description or routine duties."  *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir.

---

[11]Although Smith alleges that he made many complaints about the coworker's alleged misconduct, all of them fall within one or more of these categories.

Smith also alleges that defendants retaliated against him for having filed suit. This form of speech is addressed below.

2013).  *McArdle* further observed that "[t]he Supreme Court has noted that protection of a government employee's exposure of misconduct involving his workplace is more properly provided by whistleblower protection laws and labor codes."  *Id.*  The Court will consider the line drawn by Seventh Circuit precedent when assessing Smith's allegations, as well as the principle that a public-employee plaintiff cannot escape the strictures of *Garcetti* by simply including in his complaint the conclusory legal statement that he acted as a citizen outside the duties of his employment.  *See Tamayo*, 526 F.3d at 1092; *Abcarian v. McDonald*, 617 F.3d 931, 937-38 (7th Cir. 2010).  The Court must take a "practical" view of whether Smith plausibly alleges that he spoke as a private citizen.  *See Tamayo*, 526 F.3d at 1092; *Abcarian*, 617 F.3d at 937.

Smith fails to plausibly allege that his reports about the coworker's criminal history were made outside the scope of Smith's duties as a teacher.  According to Smith's own pleadings, his initial report pertained to the discovery of misconduct that affected order in the classroom, an area within his responsibility.  Smith stated in his email to Heiderscheidt about the discovery that he was concerned about the "commotion" it caused among his students.  (R. 32-1, Smith Aff., Ex. 5.)  He also alleges that his "first concern was the disruption that the discovery" of the coworker's criminal history "may have on the student body."  (Compl. ¶ 29.)  In the Court's view, the allegation that Smith further investigated the coworker at home on his own time and reported what he had found does not render it plausible that he spoke on this topic as a private citizen.  Smith himself characterizes the issue as involving an effort to "make [the] school and work environment safe." (Pl.'s Br. Opp'n Defs.' Mot. 3.)  Among the first people to whom Smith reported the criminal history was the GSHS safety officer, and the complaint states that Smith made his reports about the coworker with the "health, safety, and welfare of students" in mind.  (Compl. ¶ 105.)  Of course, no one contends that Smith's *routine* job duties included monitoring his fellow teachers' criminal

records. But a focus on Smith's core job duties is too narrow. *See Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008). The Court agrees with defendants that Smith offers no allegations from which the Court can infer that his reports about the coworker's criminal history were made outside of his general responsibility to ensure his students' safety and welfare.

Smith also fails to plausibly allege that his reports about the coworker's alleged possession of female students' school identification cards and "inappropriate" photos of female students fell outside the scope of his duties as a teacher. According to Smith, his reports about this alleged misconduct were occasioned by his "sexual predation concerns." (Compl. ¶ 109). In his response brief, Smith refers to the coworker's "possibly criminal sexual conduct," "possible inappropriate conduct with female students," and suspected "in-school predatory practices." (Pl.'s Br. Opp'n Defs.' Mot. 3, 6, 7.) Smith's argument that his complaints about such alleged misconduct were made as a "concerned private citizen," (*id.* 7-9), are to no avail because as a teacher, he was required by Illinois law to report suspected child abuse, *see* 325 ILCS 5/4, which includes the commission of sex offenses against a minor, 325 ILCS 5/3.

Likewise, Smith fails to plausibly allege that his reports about the coworker's internet browser history were made outside the scope of his duties as a teacher. The complaint treats this alleged misconduct as of a piece with the coworker's possession of "inappropriate photos" and student identification cards, (Compl. ¶¶ 33, 36),[12] but to the extent it can be viewed as separate from those complaints and thus not subject to statutory reporting requirements, it also affected an area

---

[12]Smith alleges that he was "gravely concerned" about the allegedly improper computer usage "[i]n light of" his discovery of the "inappropriate photographs" and identification cards of female students. (Compl. ¶ 33.) He also alleges that his "discomfort" about sharing a classroom with the coworker that stemmed from his discovery of the browser history was "only heightened by the fact that [Smith] had recently discovered that [the coworker] kept" the photographs and identification cards in the shared teachers' desk in Room 319. (*Id.* ¶ 36.)

within Smith's responsibility, his use of a work computer he shared with the coworker.[13]  Thus, Smith's speech about it was made as an employee.

As for Smith's report about the field trip charges and his suspicion that the coworker planned to "misappropriate" District funds, (Compl. ¶ 62), plaintiff also fails to plausibly allege that this alleged misconduct did not affect an area within his responsibility.  The complaint alleges that Smith participated in the field trip.  (*Id.* ¶ 74.)  His awareness of the activities and costs associated with the field trip derive from that participation.[14]  The only reasonable inference to be drawn from the allegations is that the speech was made as an employee, not as a private citizen.

Smith also fails to plausibly allege that he spoke as a private citizen when he made reports about the coworker's threatening and "bullying" behavior and allegedly false accusation that Smith failed to cover a class for him.  Smith was complaining about a coworker's treatment of staff and students in the workplace.  (*Id.* ¶¶ 101-102.)  The only reasonable inference is that Smith was speaking pursuant to his official duties.

Smith's contention that he was speaking as a private citizen by initially speaking to Officer Schreiner and by making reports about the coworker to Heiderscheidt and then directly to Torres, who, in plaintiff's view, was "outside" the "chain of command" (Pl.'s Br. Opp'n Defs.' Mot. 9-10 & Compl. ¶ 68), is belied by his other allegations that he made his reports to Mallory and then

---

[13]Indeed, Smith's concerns about the computer prompted his request for a room change.  (R. 32-2, Smith Aff., Ex. 7.)

[14]Plaintiff concedes in his response brief that he was required to submit a cost analysis as part of his participation in the field trip, but argues that he "raised his concern [] about student monies *before* any analysis was required by school officials."  (Pl.'s Br. Opp'n Defs.' Mot. 9 (emphasis in original).)  The timing of plaintiff's submission is of little consequence if he was nonetheless fulfilling a requirement of participating in the field trip.

Johnson.[15] Smith expressed frustration with Mallory's responses and attempted to skip a step in the chain of command, but when directed to follow it, he did. (Compl. ¶ 66-67.) It matters not that Smith also expressed his "concerns" to Schreiner and Heiderscheidt. Smith concedes in his response brief that he "reported within his chain of command, as appropriate." (Pl.'s Br. Opp'n Defs.' Mot. 10.) Smith's allegations that he repeated his complaints to his union representatives do not mean that he was speaking as a private citizen. *See Bryant v. Gardner*, 587 F. Supp. 2d 951, 962 (N.D. Ill. 2008) (rejecting plaintiff's argument that he spoke as a private citizen by stepping "outside the chain of command" and repeating to his union delegate the complaints he had made pursuant to his job duties). Smith's allegation that "the issues presented in his reports were not matters over which he had any authority to act and were not within his job description," (Compl. ¶ 104), also fails to plausibly allege that he was acting as a private citizen; it misses the point. The Court does not ask whether Smith supervised the coworker or had authority to act on the reported misconduct, *see Vose*, 506 F.3d at 571, and the inquiry is not limited to Smith's job description, *see id.* at 569.

Smith argues that he spoke out about the coworker "to protect the public from a teacher with a history and the potential for criminal conduct" and that his speech "arose out of matters" he discovered after acquiring "knowledge that would cause any citizen grave concern." (Pl.'s Br. Opp'n Defs.' Mot. 11.) His argument often blurs the lines between the separate inquiries of whether he was speaking as a private citizen and whether he was speaking about matters of public concern. "Even where speech relates to matters 'of the utmost concern to the public,' it will not be afforded constitutional protection if it was made as 'part of the tasks that [the plaintiff] was employed to

---

[15]As for plaintiff's calls to Officer Heike, (Compl. ¶ 104), plaintiff fails to allege the substance of his reports and fails to link any instance of alleged retaliation to those calls rather than to the numerous complaints he directed to school officials.

perform.'" *Bryant*, 587 F. Supp. 2d at 963 (alteration in original) (quoting *Sigsworth*, 487 F.3d at 511).  Furthermore, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).  Because Smith has not plausibly alleged that he spoke as a private citizen rather than as a public schoolteacher when making reports about his coworker's misconduct, he fails to allege that this speech was constitutionally protected, and the Court need not reach the issue of whether the speech addressed matters of public concern.

Smith also alleges that defendants retaliated against him for filing his state-court suit on March 20, 2013.  (Compl. ¶¶ 3, 98.)  There are three allegedly retaliatory acts that took place after Smith filed suit, all of which took place during the 2013-2014 school year: (1) docking his pay for late arrivals and early departures; (2) "threaten[ing] to severely discipline him should he continue to report" about the coworker; and (3) instructing Human Resources and staff not to meet with or take complaints from Smith.  (*Id.* ¶¶ 106, 107, 111.)  Because the suit was filed many months (and, as to the second and possibly third actions, more than a year) before any of this alleged retaliation occurred, the Court cannot reasonably infer from its timing that the suit was a motivating factor.  And Smith does not attempt to allege additional facts from which it can be plausibly inferred that the suit was a motivating factor for defendants' actions.  (He also oddly speculates that the retaliation was "perhaps due to" his *dismissal* of the action, Compl. ¶ 100.)  Moreover, plaintiff also fails even to conclusorily allege that his state-court suit constituted speech on a matter of public concern, as is required for a public employee's claim of retaliation for having filed a lawsuit.  *See Zorzi v. Cnty. of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994).  What Smith does allege is that he filed an IWA suit "to enjoin [defendants] from further retaliatory actions," which is a personal grievance, and that he dismissed the suit after his motion for a restraining order was denied.  (Compl. ¶¶ 98-

99.)[16]

Because plaintiff fails to state a claim against Mallory and Rodriguez, Count I is dismissed, and the Court need not reach defendants' argument regarding qualified immunity.

## C.    *Monell* Claim Against the District (Count II)

As discussed above, Smith fails to state a claim against Mallory and Rodriguez for a violation of his constitutional rights.  Therefore, he has no basis to support a *Monell* claim.  *See Palka v. Shelton*, 623 F.3d 447, 455 (7th Cir. 2010) "[B]ecause [plaintiff's] complaint fails to state a claim for any constitutional violation, the City and County cannot be held liable; a *Monell* claim requires a municipal policy or practice that results in a constitutional deprivation."); *see also D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 687 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1308 (2014) ("[T]he complaint fails to state an equal-protection claim against [the individual defendants].  With that conclusion, the *Monell* claim against [the muncipal entity] necessarily fails.").

In addition, Smith fails to adequately plead a *Monell* claim because he alleges no facts suggesting that the alleged retaliation was attributable to a District policy.  To state a *Monell* claim, a plaintiff must plead facts that allow a reasonable inference that the plaintiff's injuries resulted from "official municipal policy," which can take three forms: "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

Smith alleges that the District violated his rights pursuant to a widespread practice and through the acts of its policymakers.  (Compl. ¶¶ 131-34.)  The Seventh Circuit has declined to "adopt any bright-line rules defining a 'widespread custom or practice.'"  *Thomas v. Cook Cnty.*

---

[16]Smith's brief in response to defendants' motion does not mention the lawsuit at all.

*Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three." *Id.* (citations and internal quotation marks omitted). Smith alleges that the District has a widespread practice "of trying to silence any employee who raises claims involving District employees' criminal conduct, and to protect criminals or other District employees hired as teachers as a result of their political connections." (Compl. ¶ 115.) Without citing authority, Smith asserts that in addition to his allegations about his own experience, his allegations that Nemec was also threatened with discipline if he continued to make reports about the coworker, and that his speech was thus "chilled," (Compl. ¶¶ 107-108), are sufficient to adequately plead a widespread practice. (Pl.'s Br. Opp'n Defs.' Mot. 17.)

The Court disagrees. The facts set forth regarding Nemec do not constitute even a second instance of alleged wrongdoing, because the complaint alleges that Nemec "made reports" along with Smith about the same coworker as part of the same course of action.[17] Plaintiff fails to allege that other employees who reported about coworkers' criminal conduct were "silenced" in an effort to "protect criminals" or alleged political hires, or any other facts from which the Court can reasonably infer that the District has this widespread practice. Furthermore, to the extent that plaintiff relies on his allegation in paragraph 115 of the complaint that the Board "refused to act" on his reports because of the alleged widespread practice, it is an insufficient basis on which to reasonably infer such a practice. *See Blazquez v. Bd. of Educ. of City of Chicago*, No. 05 C 4389, 2006 WL 3320538, at *9 (N.D. Ill. Nov. 14, 2006) ("Generally, mere failure to act is not a sufficient

---

[17]It also appears that in many instances, Nemec participated in the meetings described in the complaint at plaintiff's behest in Nemec's capacity as building representative for the teachers union. (*See, e.g.*, R. 32-2, Smith Aff., Exs. 11, 13, 14.)

basis on which to infer a custom or policy.") (citing *Smith v. Chicago Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1149 (7th Cir. 1999)).

As for the "policymaker" basis for Smith's *Monell* claim, "[s]tate law determines who legally constitutes a final policymaker." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (citing *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997)). Plaintiff does not contend that Mallory and Rodriguez were policymakers in this sense, but that they "acted with final policymaking powers delegated to them by the School Board and/or their unlawful and retaliatory actions were clearly authorized or ratified by the School Board." (Compl. ¶ 126.) Under the delegation theory, "the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions." *Darchak*, 580 F.3d at 629. The "mere unreviewed discretion" to make decisions does not amount to a delegation of *policymaking* authority. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009). The question is whether the actor/decisionmaker "was at the apex of authority for the action in question." *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011). A "§ 1983 claim based on a 'ratification' theory must allege that a municipal official with final policymaking authority approved the subordinate's decision *and the basis for it*." *Darchak*, 580 F.3d at 630 (ellipsis omitted) (quoting *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998)).

Smith fails to plausibly allege that Mallory or Rodriguez was a final policymaker under either the delegation or ratification theory. Smith contends that he has adequately alleged that they were the policymakers "regarding the retaliatory acts," citing the following allegations: Mallory "presided over" the meeting in which Arrington told Smith he was "sneaky" and "had no balls"; Mallory "accused Smith of impugning his integrity and his ability to conduct an investigation"; Mallory stated his intent to get Smith "outta here"; Mallory advised Smith of his suspension and

28

"executed" it; Mallory told Salazar to lie about the altercation with Smith; Rodriguez "monitored" all of these actions and "marshaled a selective and untruthful case" against Smith; Rodriguez advised the Board and HR "not to talk to" Smith or Nemec; and Rodriguez presented the matter of the altercation to the Board and then "joined" the Board in its deliberations. (Pl.'s Br. Opp'n Defs.' Mot. 19-20.) These allegations, at the most, support a reasonable inference that Mallory and Rodriguez had some decisionmaking power, but not that the Board entrusted to Mallory or Rodriguez any policymaking power. *See Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001) ("Delegation is not direction; authorization is not command; permission does not constitute the permittee the final policymaking authority."). These allegations also fail to support an inference that the Board ratified the individual defendants' actions. That the Board followed Rodriguez's suspension recommendation is not enough to allege that Rodriguez was a final policymaker, and Smith alleges no facts from which the Court can infer that the Board was aware of any potential retaliatory basis for the suspension. *See Darchak*, 580 F.3d at 630.

For the reasons explained above, Count II is dismissed.

## D. Dismissal With Prejudice

The Court is dismissing plaintiff's federal claims. Defendants seek a dismissal with prejudice. Plaintiff does not address the matter and does not request a without-prejudice dismissal in the event of dismissal. Having amended his complaint twice in response to two previous motions to dismiss, Smith has had three opportunities to plead his claims, so dismissal of his federal claims with prejudice and without an opportunity to amend is warranted. *See Agnew v. NCAA*, 683 F.3d 328, 347 (7th Cir. 2012).

## E. IWA Claim (Count III)

Pursuant to 28 U.S.C. § 1367(c)(3), the Court is permitted to decline to exercise

supplemental jurisdiction over a state-law claim if it has dismissed all claims over which it has original jurisdiction. In this circuit, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998). Because the Court is dismissing the federal claims in this action with prejudice, it will relinquish supplemental jurisdiction over plaintiff's state-law claim under the IWA in Count III. Accordingly, that claim is dismissed without prejudice to refiling in state court.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the verified second amended complaint [43] is granted. Counts I and II of the Second Amended Complaint are dismissed with prejudice, and the Court relinquishes supplemental jurisdiction over Count III and dismisses that claim without prejudice to refiling in state court. Civil case terminated.

**SO ORDERED.**                    **ENTERED:    August 13, 2015**

_____
**JORGE L. ALONSO**
**United States District Judge**